**Paula G. STITZ, Plaintiff,**

v.

**CITY OF EUREKA SPRINGS, ARKANSAS, Defendant.**

No. 97–3054.

United States District Court,
W.D. Arkansas,
Harrison Division.

June 12, 1998.

Stephen L. Wood, Rogers, AR, for Plaintiff.

Thomas N. Kieklak, Arkansas Municipal League, North Little Rock, AR, Jay C. Miner, City Attorney, Rogers, AR, for Defendant.

## MEMORANDUM OPINION

WATERS, District Judge.

Plaintiff brought this action under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, for employment discrimination on the basis of gender and for retaliation. Currently before the court is defendant's motion for summary judgment and plaintiff's response thereto. The court finds, for the reasons set forth below, that defendant's motion should be granted. Accordingly, plaintiff's case will be dismissed without prejudice.

### I. FACTS

In 1979, plaintiff was hired by defendant as an animal control officer. She also worked for defendant as a police officer. Plaintiff was appointed as defendant's Chief of Police in November of 1988.

On January 1, 1995, Barbara O'Harris became defendant's Mayor (the "Mayor"). In April of 1995, the Mayor reappointed plaintiff to her position as Chief of Police. Plaintiff held that position until her termination on August 13, 1996.

As Chief of Police, plaintiff was defendant's highest ranking police officer. Defendant asserts that plaintiff set all policy concerning the day to day operations of the police department and had the primary responsibility for hiring and firing police department personnel. Defendant's personnel policy handbook states that "[e]ach Department Head is authorized to adopt lawful oral or written policies governing the day-to-day operations of that department." *Defendant's Exhibit "K,"* at 28. Defendant's handbook also states, however, that "[d]epartmental policies, if in conflict with the City's employee policies and procedures, will be governed by the City's employee policies and procedures." *Id.*

Plaintiff disputes that she set all policy concerning the day to day operations of the police department. Rather, plaintiff asserts that Don Young, the Mayor's administrative assistant, controlled the operations of the police department.

The Mayor hired Don Young as her administrative assistant in February of 1996. Young was responsible for the day to day operations of defendant and reported directly to the Mayor. All of the department heads, including plaintiff, reported to Young, and Young was responsible for evaluating their job performances on behalf of the Mayor. Defendant contends, however, that Young did not share the Mayor's decision-making authority when it came to the hiring and firing of personnel. During the relevant time period, there were six department heads, and plaintiff was the only female department head.

Plaintiff contends that Young told plaintiff that he was in control of the Mayor's office. Plaintiff cites the affidavit of Jim Walden, the former administrative assistant to the Mayor, in which he stated that while he worked for the Mayor he became frustrated "because she would not or could not make decisions." *Plaintiff's Exhibit "A,"* at ¶ 9. In addition, Walden stated that the Mayor often looked to him to make decisions for her, and that she often deferred to him to make decisions on important matters, such as personnel. *Id.*

Problems began between plaintiff and Young almost immediately after he was hired. Plaintiff asserts that Young began "micromanaging" the police department. *Plaintiff's Deposition,* at 29. Specifically, she stated in her deposition that Young "wanted copies of all the reports;" "want[ed] specifics about every investigation;" and "[sat] in on police discussions about cases." *Id.* In addition, plaintiff stated in her affidavit that Young "decided what types of reports the Police Department needed to generate and what statistics needed to be kept;" "directed [plaintiff] to remove a television set from the dispatch area;" and told her that her officers were purchasing gasoline from the wrong filling station. *Plaintiff's Affidavit,* at ¶ 4. Furthermore, plaintiff stated that after Young was hired, she lost the authority to select employees for her department. Plaintiff described Young's overall management style as "more intensive" than any other administrative assistant or mayor. *Plaintiff's Deposition,* at 29.

Plaintiff asserts that when she first met Young, she asked him to lunch so that she could show him around town. Plaintiff asserts that Young declined to go with her and stated that he knew the town better than she

did. In addition, plaintiff asserts that he stated that he did not have lunch with any women other than his wife. Plaintiff was offended by the remark because she believed he was refusing to have lunch with her because of her gender. In addition, she believed that Young thought it was inappropriate that she asked him to lunch because she was a woman. Plaintiff did not report the incident.

Plaintiff contends that Young made sexist and bigoted remarks in her presence on several occasions.[1] On one occasion, plaintiff stated that she noticed Young was looking over her shoulder during a conversation they were having in the Mayor's office. Plaintiff stated that she asked Young what he was looking at, and that he responded "[t]hat woman with the short shorts on. She's got great legs." *Defendant's Exhibit "C,"* at 14. Plaintiff was offended because she felt Young was not paying attention to what she was saying and was remarking about women during a business conversation. Plaintiff thought that his conduct was "very inappropriate." *Id.* Plaintiff reported the incident to Sheila Seratt, a member of the City Council who was acting as the liaison between the police department and the City Council in 1996. Seratt, however, had no law enforcement authority or supervisory authority over the police department. Seratt's duty was to report matters concerning the police department to the City Council.

Plaintiff also stated in her deposition that Young told her once how much he liked his office because he could stare at women's legs through the window in his office in the summertime. Plaintiff also asserts that he made a comment regarding women's breasts. Plaintiff did not report these incidents. She stated in her deposition that:

> Mr. Young made it perfectly clear to me from the very beginning that he was in control of what went on in that office and that I was to go through him for anything and not bother the mayor, and I felt like that the mayor would not respond to me. She had also indicated to me that she had

absolute confidence in Mr. Young and that I was to go through him about anything. *Id.*, at 17–18.

Plaintiff contends that on another occasion, after Young had spoken with a friend on the telephone, he told plaintiff that his friend was having difficulties with his two daughters because one got "knocked up by a nigger" and the other was "a damn lesbian." *Id.* at 18. Plaintiff reported the incident to Seratt.

In addition, plaintiff stated that she introduced her niece to Young and was embarrassed when Young told her niece that he hoped plaintiff had not influenced her political views because plaintiff was a "stupid Democrat." *Id.*, at 21. Plaintiff stated that he also said something to the effect that being a Democrat was just like a woman. Plaintiff did not report the incident.

Plaintiff contends that during the monthly meetings of defendant's department heads, Young stated that plaintiff talked too much and that what she said was irrelevant, "typically woman remarks." *Id.*, at 24. Plaintiff also contends that Young treated her in a demeaning way and was very cold in public and that she believes he did not like her.

Walden, the Mayor's former administrative assistant, stated in his affidavit that he worked with Young prior to leaving his position with defendant and that Young was hostile toward plaintiff. Walden stated that Young was not hostile to the male department heads. He further stated that Young referred to plaintiff in a derogatory manner by calling her "Missy Paula." *Plaintiff's Exhibit "A,"* at ¶ 8.

Plaintiff contends that Young indicated to her that he was uncomfortable with a woman as the Chief of Police "mostly by his attitude and the way he treated [her]." *Plaintiff's Deposition*, at 28. Plaintiff further contends that Young told plaintiff that he did not believe women should have authority over men. Plaintiff never reported any of these incidents of sexist or bigoted behavior by

---

1. Plaintiff states that Young made similar statements to other people within defendant's employ and cites to the deposition of Kathie Allway at pages 5–11. The court has carefully reviewed all of the pages of Ms. Allway's deposition that were attached to plaintiff's brief, and does not believe that Ms. Allway's deposition supports plaintiff's assertion.

Young to the Mayor. Plaintiff did report these incidents to Seratt.

In addition, plaintiff contends that the Mayor was uncomfortable with women working in positions of authority. As evidence of the Mayor's feelings, plaintiff refers to an incident that occurred during the time when the Mayor was accepting applications for the administrative assistant position. Plaintiff stated at her deposition that one day she mentioned to the Mayor that she thought Kim Dickenson, a local female that had submitted a resume, was qualified and would be a good candidate for the position. She asserts that the Mayor responded: "I would not be comfortable with a woman in that position, especially one that was better educated than me." *Defendant's Exhibit "C,"* at 36–37.

Seratt stated in her deposition that, in addition to plaintiff, several people from the other departments told her that Young was using the word "nigger." *Deposition of Sheila Seratt,* at 22. Seratt also stated that she received complaints from other people that Young was making "sexist remarks." *Id.*

Plaintiff asserts that Young "unofficially" criticized her and the way she ran the police department through his demeanor. Specifically, she stated that "[i]t was [Young's] general attitude and demeanor and it was just generally the way he treated me at all times." *Defendant's Exhibit "C,"* at 25. She also stated that Young was "constantly referring to my political affiliation. He was constantly referring to it as 'female things.' He was constantly referring to women in a very derogatory manner, commenting about their breasts or their legs. It was a constant thing." *Id.,* at 26. Plaintiff also stated at her deposition that Young told her that he could run the police department better than she did.

The Mayor terminated plaintiff on August 13, 1996. Defendant's City Council reviewed the Mayor's decision, but did not override the decision.

Defendant asserts that the Mayor decided to terminate plaintiff due to numerous complaints she received about the police department. Specifically, the Mayor contends that she had received several complaints from citizens and tourists about the behavior of various police officers—neglecting their patrol duties and treating people poorly when they were arrested. Defendant asserts that several lawsuits were filed against defendant arising out of the conduct of the police officers.[2] The Mayor referred to one incident, that occurred at the Eureka Springs Blues Festival in 1995, where an auxiliary police officer brandished an automatic weapon in response to a disturbance within the crowd. The Mayor stated that many people were upset about the incident and complained to the Mayor and the City Council about the police department.

Plaintiff admits that the unfortunate incident at the Blues Festival occurred, however, she states that the police department learned from the incident and that the Blues Festival was successful in 1996. *See also Exhibit "1" to Plaintiff's Affidavit* (letter from the producer of the 1996 Blues Festival to plaintiff commending her staff for a successful festival). Seratt also stated in her deposition that ever since the incident, defendant has had very successful Blues Festivals. *See Defendant's Exhibit "E,"* at 13.

Nevertheless, defendant asserts that the Mayor believed that the public had lost confidence in the police department and that the morale of the police officers was very low. Defendant asserts it was the culmination of all of the above factors that caused the Mayor to decide to terminate plaintiff.

Defendant asserts that Young had no role in the decision to terminate plaintiff. In fact, Young asserts that he asked the Mayor not to fire plaintiff. He stated in his deposition that he felt like plaintiff could have "worked it out given more time, worked it out for a better police department...." *Defendant's Exhibit "D,"* at 14. He also stated that he knew there were numerous complaints about the police department and that he had received many himself.

---

**2.** Plaintiff asserts that none of the lawsuits filed resulted in liability to defendant. *See Deposition of Barbara O'Harris,* at 16.

Plaintiff disputes the Mayor's reasons for her termination. Plaintiff cites to Seratt's deposition in which she stated that during the four years she was on the City Council, she never received any complaints from members of the community regarding plaintiff. *See Sheila Seratt's Deposition,* at 10. In addition, plaintiff offers the affidavit of Anna Epperly, who stated that she overheard a conversation between the Mayor and a third party regarding plaintiff's termination, in which the Mayor stated that she had to make a choice between keeping Young and plaintiff. In addition, Epperly stated that she heard the Mayor state that "Young could not work with women in positions of authority and it was causing problems between [Young] and [plaintiff]." *Plaintiff's Exhibit "B,"* at ¶ 8.

In addition, plaintiff submits her employee performance evaluation, dated July 3, 1996, in which Young gave her an exceptional to outstanding rating—a total score of 46. *See Plaintiff's Exhibit "E."* Young commented on the evaluation report that plaintiff was "dedicated to her responsibilities, loyal to her department and the City" and was "recognized as a professional in [the] law enforcement community." *Id.,* at 4. In addressing plaintiff's weaknesses, Young stated that plaintiff needed to be "more assertive in supervision" and that she tended to "put things off." *Id.* Plaintiff notes that the fire chief received a slightly lower score, a 45, and he was not terminated from his position. *See Plaintiff's Exhibit "F."* Plaintiff points out that although this evaluation came only weeks before plaintiff's termination, there is no mention, or threat, of discharge if plaintiff's performance failed to improve.

Plaintiff was replaced by a male, Earl Hyatt. Hyatt had no previous experience as a Chief of Police. He was originally appointed by the Mayor as interim Chief of Police based on the recommendation of Jay Miner, defendant's City Attorney.

Plaintiff filed a charge of discrimination with the EEOC on or about October 1, 1996. Plaintiff alleged that defendant discriminated against her on the basis of her gender. *See Plaintiff's Exhibit "H."* Plaintiff based her allegation on the remarks made by Young to her, and the remarks made by Young to other people regarding women in the Chief of Police position. Plaintiff asserts that after she was terminated, one of the police officers told her that Young asked them if they were "glad that they didn't have to have a woman in [the department] anymore." *Defendant's Exhibit "C,"* at 34. Plaintiff received a notice of right to sue based on her charge of gender discrimination against defendant on May 20, 1997.

After she was terminated, defendant, through Young, initiated two investigations of plaintiff through the Arkansas State Police. One investigation concerned the homicide of a black male in August of 1993 in Eureka Springs. Plaintiff's investigation had produced no suspects in connection with the man's death. Young stated in the *Eureka Springs Times–Echo* that he was uncomfortable that the case had been "put on hold" during plaintiff's administration. *Plaintiff's Exhibit "D."* Hyatt was asked to reactivate the case "to make sure all possible leads had been exhausted." *Id.*

The other investigation concerned an alleged shortage in parking fees. In March of 1997, the prosecuting attorney determined that there was insufficient evidence to support a criminal prosecution regarding the alleged discrepancies of the parking fees. *See Exhibit "2" to Plaintiff's Affidavit*

These investigations were ongoing while defendant was advertising for a "permanent" Chief of Police. (Plaintiff asserts that defendant launched these investigations so that it would be poised to dismiss plaintiff as a candidate due to the pending investigations.) The advertisement stated that:

> [a]pplicants should contact the City of Eureka Springs for an application as well as a personal history statement. Address all inquiries to Barbara A. O'Harris, Mayor, City of Eureka Springs.... Mark on outside of envelope, Police Chief Application. Please call 501 253 9703 for application and personal history statement. Applications will not be accepted after, 5 PM, February 14, 1997.

*Defendant's Exhibit "I."*

The advertisement contained confusing instructions as to the proper means by which to obtain an application packet. In other

words, it was unclear whether an applicant was supposed to write to the Mayor, or call the telephone number advertised, to obtain an application packet. Apparently, the Mayor and her advisors considered this confusing application process to be a "test." The Mayor believed that anyone who was not persistent enough to obtain an application packet did not show sufficient initiative to qualify for the position of Chief of Police.

Plaintiff sent her resume and a letter to the Mayor requesting an application and a statement of personal history so that she could apply for the position. Plaintiff labeled her envelope "RE: Police Chief Application." Defendant asserts that the Mayor did not open plaintiff's envelope, or any other envelopes with similar markings. All correspondence received was stored by Young until the application deadline had passed. Defendants assert that the Mayor did not want to open any of the correspondence because she did not want any applicant to receive favorable treatment merely because that applicant's packet arrived earlier than others.

The Mayor contends that plaintiff was not considered for the position because she failed to *telephone* the Mayor to request the application packet. Plaintiff asserts, however, that Hyatt, the man that replaced her, also failed to *telephone* the Mayor to request an application or personal history statement.

The Mayor opened the envelope from plaintiff after the application deadline had passed. Because plaintiff had not completed an application form, the Mayor did not consider her for the position.

On or about May 2, 1997, plaintiff filed another EEOC charge of gender discrimination and retaliation against defendant. The EEOC issued a notice of right to sue based upon that charge of discrimination and retaliation on May 13, 1997.

In April of 1998, the Mayor fired Young. The Mayor cited "irreconcilable differences" as her reason for terminating Young. *See Plaintiff's Exhibit "C."*

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart,* 813 F.2d 874, 878 (8th Cir.1987); Fed. R.Civ.P. 56(c). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. U.S.,* 600 F.2d 725, 727 (8th Cir.1979). In *Counts v. M.K. -Ferguson Co.,* 862 F.2d 1338 (8th Cir.1988), the court, reviewing the burdens of the respective parties, stated:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.,* "[to] point[ ] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.,* at 1339 (*quoting City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original)).

However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of all the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.,* 883 F.2d 594, 598–99 (8th Cir. 1989) *(citing Trnka v. Elanco Products Co.,* 709 F.2d 1223, 1225 (8th Cir.1983)).

## III. DISCUSSION

### A. Employee as Defined by Title VII

■ Defendant contends that the Chief of Police is not an employee as defined by Title VII. Specifically, defendant asserts that the Chief of Police falls outside the protective scope of Title VII under the "policymaking" exemption of § 2000e(f).

Under Title VII:

[t]he term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.

\*　　\*　　\*　　\*　　\*　　\*

42 U.S.C.A. § 2000e(f) (1994) (emphasis added).

Under Arkansas law, the Mayor has the power to appoint and remove all department heads, unless the city council, by a two-thirds vote, overrides her decision. *See* Ark.Code Ann. § 14–42–110(a)(1) (Repl.1998). It is undisputed that the Mayor, an elected official, appointed plaintiff to her position as Chief of Police. Thus, the key issue in this case is whether plaintiff was an appointee on the policymaking level while she served as Chief of Police.

■ Title VII does not define "appointee on the policy making level." The Eighth Circuit has stated that whether an individual is on a policymaking level "depends on several factors." *Stillians v. State of Iowa,* 843 F.2d 276, 278 (8th Cir.1988), *abrogated on other grounds, Astoria Federal Sav. and Loan Ass'n. v. Solimino,* 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).[3] These factors include: 1) whether the appointee had discretionary rather than solely administrative powers; 2) whether the appointee served at the pleasure of the appointing authority; and 3) whether the appointee formulated policy. *Id.,* at 278–79. Plaintiff's status under Title VII is a question of federal law, however, we look to state law to determine the scope of authority given to the Chief of Police. *Id.,* at 279.

The Eighth Circuit in *Gregory v. Ashcroft,* 898 F.2d 598, 603 (8th Cir.1990), stated that "Congress's designation of 'appointee[s] on the policymaking level' as an exemption to the ADEA definition of 'employee' manifests an interest in excluding persons entrusted with extensive decisionmaking authority and discretionary power from the protection of the Act." The court also stated that the list of factors set out in *Stillians* was not meant to be exhaustive or necessarily applicable to every kind of appointed official.

Under Arkansas law, the chief of police has the authority and the duty: 1) to execute all process; 2) to appoint deputies, and be responsible for those deputies; 3) to suppress all riots, disturbances, and breaches of the peace; and 4) to pursue, arrest and detain persons fleeing from justice. *See* Ark. Code Ann. § 14–52–202 (Repl.1998).[4] The Eighth Circuit has recently noted that this position is "arguably a policy-making posi-

---

**3.** *Stillians* involved an ADEA claim, however, the court's analysis is applicable in this case because the definition of employee under the ADEA and Title VII are the same. *See* 29 U.S.C.A. § 630(f) (1985) (ADEA's definition of employee).

**4.** The court notes that this section of the Arkansas Code Annotated applies to cities of the first class. The parties have not addressed this issue, however the court believes that defendant has been a city of the first class for over a hundred years. *See Condon v. City of Eureka Springs,* 135 F. 566 (C.C.W.D.Ark.1905) (court recognizes that the City of Eureka Springs is a city of the first class).

tion." *Miller v. Compton,* 122 F.3d 1094, 1100 (8th Cir.1997).

In *Miller,* plaintiff brought a § 1983 action against the police chief and the City of El Dorado for actions taken by a police officer. The general rule is that under § 1983, municipal liability only arises if the injury results from action taken pursuant to official municipal policy. The court noted, however, that liability may arise from "a single act of a policy maker. . . ." *Id.* (internal quotation marks and citation omitted). The court stated that under Arkansas law, § 14–52–202, a *police chief* may be in a policymaking position, however, a *police officer* is not in such position. Thus, the court determined that plaintiff's argument was simply an attempt to impose liability under the theory of respondeat superior, which is precluded under § 1983. *See also Angarita v. St. Louis County,* 981 F.2d 1537, 1547 (8th Cir.1992) (§ 1983 action where court held that superintendent of police was a final policymaker for the police department, and thus, actions taken by the superintendent were sufficient to impose liability on the municipality). *But Cf. Morro v. City of Birmingham,* 117 F.3d 508, 515 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1299, 140 L.Ed.2d 465 (Mar. 23, 1998) (Police chief is not final policymaker because his decisions are subject to administrative review, and thus, the city cannot be held liable under § 1983 for the chief's actions).

Thus, under § 1983, municipal liability can only be imposed if the actor is a "final" policy maker. The test is less stringent under Title VII, however, which only requires that the appointee be on the "policy making level."

As evidence that plaintiff was on a policymaking level, defendant points to the fact that as the Chief of Police, plaintiff was the highest ranking police officer in defendant's police department. In addition, defendant asserts that its policy was to allow the Chief of Police to adopt all lawful policies to govern the day-to-day operations of the police department. *See Defendant's Exhibit "K,"* at 28. Furthermore, defendant asserts that at the time of her termination, plaintiff was working on a revised policy manual for the police department. The manual was subsequently finished by her successor, Earl Hyatt.

In addition, under Arkansas law, the Chief of Police has the power to execute all process, appoint deputies, suppress riots, disturbances and breaches of the peace, and pursue and arrest. Thus, under both the Arkansas statutes and defendant's policies, the Chief of Police has the power to enforce the law according to his or her own individual judgment. Thus, plaintiff had discretionary authority. For example, plaintiff had the power to direct her officers to suppress riots, disturbances and breaches of the peace according to the police department policies that she established.

In support of her contention that she did not act on the policymaking level, plaintiff asserts that she was subject to Young's constant intrusion into the day to day operations of the police department. Plaintiff contends that after Young was hired, her policy making authority was substantially eroded, if it ever existed. In addition, plaintiff admits that she was working on a policy manual at the time of her termination, however, she asserts that the manual would not have been implemented without involvement and/or modification by Young, the Mayor or the City Council.

In *E.E.O.C. v. Board of Trustees of Wayne County Community College,* 723 F.2d 509, 511 (5th Cir.1983), a similar issue was before the Fifth Circuit. In *Board of Trustees of Wayne County Community College,* the issue was whether the president of a community college was on the policymaking level, and thus, was not an employee as defined by the ADEA. The court found that the president was an appointee on the policymaking level. In its holding, the court recognized that under Michigan laws, the Boards of Trustees of the community colleges had broad authority to direct and govern the community colleges. The court stated, however, that "[t]he exercise by the board of extensive policymaking power does not preclude, and in fact is complimentary to, the concurrent exercise of wide-ranging policymaking authority by the president as the highest appointed official of the college." *Id.* The court also stated that "[t]he fact that there exist some decisions that the president cannot, or would not choose, to make alone, does not diminish the

very significant policymaking power that he possesses." *Id.*

Thus, because plaintiff had to obtain the approval of Young, the Mayor, or the City Council, before proceeding with certain policies, does not mean that plaintiff was not on a policymaking level. Furthermore, because plaintiff had to yield to certain policies of Young, the Mayor, or the City Council, does not necessarily mean that plaintiff was not on a policymaking level. Therefore, as we stated above, plaintiff may still be an "appointee on the policy making level" under Title VII, even though she did not possess "final" decision making power as is required by § 1983.

We conclude that plaintiff held a policymaking position when she served as Chief of Police. Given her assigned powers and duties, we believe the position of Chief of Police, the highest ranking position in defendant's police department, was on a policymaking level.

We note that although the parties have not addressed the issue, plaintiff is not exempted from the policymaking exemption by the civil service laws of Arkansas or the City of Eureka Springs. Although the record is unclear as to whether defendant has established a civil service system, even if it had, members of the police department are not covered by a city's civil service system. *See* Ark.Code Ann. § 14–49–301(b)(1)(F) (Repl.1998). Furthermore, the court presumes, in the absence of evidence to the contrary, that defendant has not established a civil service commission to govern the police department. *See generally* Ark.Code Ann. §§ 14–51–101–311 (Repl. 1998).

Therefore, because we conclude that plaintiff was an appointee on a policymaking level, and is not covered by defendant's civil service laws, plaintiff is not protected by § 2000e of Title VII. That does not end our inquiry, however, because under the 1991 Amendments to the Civil Rights Act, persons who were previously exempt from the protections of Title VII are now protected.

### B. The 1991 Amendments to the Civil Rights Act

■ As part of the 1991 Amendments to the Civil Rights Act, Congress enacted the Government Employee Rights Act of 1991 (the "GERA"). The GERA "makes the substantive standards of Title VII applicable to those state employees that are chosen or appointed by an elected official to be a member of his or her personal staff, or to serve as an advisor or as policy level staff." 1 Lex Larson, *Employment Discrimination* § 4.06 at 4–36 (2d ed.1997). Plaintiff contends that even if she is exempt under Title VII, she is covered by the GERA.

■ Defendant asserts in its reply brief that the court cannot reach the issue of whether plaintiff is covered under the GERA because plaintiff's complaint does not state a claim under the GERA. We find defendant's argument without merit. Plaintiff's complaint was brought pursuant to "Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991." *Complaint,* at ¶ 1. Admittedly, plaintiff did not specifically state a claim under the GERA, which is found at Title III of the Civil Rights Act of 1991, however, the court believes that defendant was put on notice as to plaintiff's claims, and thus, we will address the merits of plaintiff's case under the GERA.

The GERA provides that all personnel actions affecting State employees shall be made free from any discrimination based on the basis of race, color, religion, sex, national origin, age or disability. 2 U.S.C.A. § 1202 (1997). The GERA further provides that the rights, protections, and remedies provided under the GERA apply with respect to employment of any individual chosen or appointed, by a person elected to public office in any State or political subdivision of any State by the qualified voters thereof to serve the elected official on the policymaking level. 2 U.S.C.A. § 1220(a) (1997).

The GERA permits any individual to file a complaint alleging a violation with the EEOC within 180 days after the occurrence of the alleged violation. 2 U.S.C.A. § 1220(b)(1) (1997). The EEOC, in accordance with the principles and procedures of the Administrative Procedure Act, 5 U.S.C.A. §§ 554–557, shall determine whether a violation has occurred and shall set forth its determination in a final order. *Id.* If the EEOC determines that a violation has occurred, the final

order shall provide for appropriate relief. *Id.*

The remedies available under the GERA are the same as are allowed under Title VII, with two significant exceptions. Under the GERA, a plaintiff is not entitled to recover punitive damages and is not entitled to a jury trial.

Rather, under the GERA, any party aggrieved by a final order issued by the EEOC "may obtain a review of such order under chapter 158 of Title 28." 2 U.S.C.A. § 1220(c) (1997). The court shall decide all relevant questions of law and interpret constitutional and statutory provisions. 2 U.S.C.A. § 1220(d) (1997). The court shall set aside a final order issued by the EEOC if it determines that the order was "(1) arbitrary, capricious, an abuse of discretion, or otherwise not consistent with the law; (2) not made consistent with required procedures; or (3) unsupported by substantial evidence." *Id.*

There are few cases interpreting the provisions of the GERA as they apply to previously exempt State or local employees. After a careful reading of the statutes, however, the court believes that the case is not properly before the court at this time for the following reasons.

Plaintiff filed two charges of discrimination with the EEOC, and the EEOC has issued two notice of right to sue letters. In the first charge of discrimination, plaintiff alleged that defendant terminated her based on her gender. In the EEOC's notice of right to sue letter to plaintiff on that charge, the EEOC stated that it had not made a judgment as to whether or not plaintiff's claim had merit. *See Exhibit "B" attached to Complaint.* Thus, clearly, the EEOC had not made a "determination" as to whether a violation had occurred as is required under the GERA.

In the second charge of discrimination, plaintiff alleged that defendant retaliated against her when it failed to respond to her request for an application packet. In the EEOC's notice of right to sue letter on plaintiff's claim of retaliation, the EEOC made the following determination:

The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the infor-

mation obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

*Exhibit "D" attached to Complaint.* Thus, it appears that the EEOC made somewhat of a determination as to plaintiff's retaliation charge, however, it is unclear as to whether that determination satisfies the requirements of the GERA. As stated above, the GERA requires that the EEOC issue a determination in accordance with the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 554–557.

In *Guy v. State of Ill.,* 958 F.Supp. 1300 (N.D.Ill.1997), the court dismissed plaintiff's claims without prejudice to their refiling after the proper EEOC administrative proceedings had been concluded. The court noted that although the plaintiff had filed a charge of discrimination and received a right to sue letter, "the proceeding before the EEOC was far from a full adversarial proceeding." *Id.,* at 1306. The court stated that "[u]nder the GERA, the federal district court only has jurisdiction to review administrative determinations once the issues have been hashed out at the administrative level." *Id.*

Thus, under the GERA, judicial review only arises after the EEOC has made a determination as to whether a violation has occurred, and has issued a final order. Therefore, plaintiff's claims, to the extent that the EEOC has not made a determination as to whether a violation has occurred, must be dismissed, as they are not ripe for judicial review

■ More importantly, however, we do not believe that under the GERA, the district court is the court that can exercise judicial review of an EEOC determination. Rather, we believe that the court of appeals has such jurisdiction. The GERA states that "[a]ny party aggrieved by a final order [issued by the EEOC] may obtain a review of such order under chapter 158 of Title 28." 2 U.S.C.A. § 1220(c) (1997). Chapter 158 of Title 28 is the Administrative Orders Review Act, which sets out the jurisdiction of the

court of appeals. We note, however, that we are unable to find any cases that have read the GERA in this manner. In any event, we read the statute to say that any party aggrieved by a final order of the EEOC may seek judicial review by the court of appeals.

It is clear that under the GERA, presidential appointees may only seek judicial review of an EEOC final order by the United States Court of Appeals for the Federal Circuit. *See* 2 U.S.C.A. § 1219(a)(3)(A) (1998). *See also* 17 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 4104 at 146 (Supp.1998) (Under the GERA, a presidential employee may appeal a decision of the EEOC to the Court of Appeals for the Federal Circuit.)

In addition, the authors of *American Jurisprudence* state that in addition to presidential employees, employees of state and local officials may also seek review of an EEOC final order by the Federal Circuit. *See* 45B Am.Jur.2d, *Job Discrimination* § 2083 at 688 (1993) (The GERA "provides that any party aggrieved by a final order of the EEOC ... with respect to employment of presidential appointees, or employment by elected state or local officials, may petition for review by the U.S. Court of Appeals for the Federal Circuit.") *Id.* (footnotes omitted).

### III. CONCLUSION

We conclude that plaintiff is exempt from the protections of Title VII, and thus she must pursue her claim under the GERA. In addition, we conclude that under the GERA, the federal district court is not the proper court for a plaintiff to seek judicial review of a final order of the EEOC. Therefore, defendant's motion for summary judgment will be granted, and plaintiff's case will be dismissed without prejudice. A separate order shall be entered concurrently herewith.